**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARCHARADON, LLC and DAVID SWEIG, | ) ) ) | |
| Plaintiffs, | ) ) | No. 21 C 2890 |
| v. | ) ) | |
| ASCEND ROBOTICS, LLC, | ) ) | |
| Defendant. | ) ) | |
| | ) | |
| CARCHARADON, LLC and DAVID SWEIG, | ) ) ) | |
| Plaintiffs, | ) ) | No. 21 C 6841 |
| v. | ) ) | Judge Sara L. Ellis |
| DAVID ASKEY, | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiffs Carcharadon, LLC and David Sweig ("Plaintiffs") filed two substantially similar lawsuits against Defendants Ascend Robotics, LLC ("Ascend") and David Askey, alleging that Defendants lied to Plaintiffs to induce them to work on a joint venture and then cut Plaintiffs out of the joint venture and profited from it themselves. The Court addressed Plaintiffs' initial complaints in an August 29, 2022 Opinion and Order, allowing their promissory estoppel and quantum meruit claims to go forward but dismissing all others. Case No. 21 C 2890, Doc. 37. Plaintiffs then filed a second amended consolidated complaint (the "SAC").[1] In the SAC, Plaintiffs bring claims of fraud, promissory fraud, negligent misrepresentation, breach

---

[1] Because Plaintiffs filed a consolidated complaint, unless otherwise noted, all docket references are to the docket in Case No. 21 C 2890.

of fiduciary duty, and equitable and promissory estoppel against both Defendants and a quantum meruit claim against Ascend Robotics, LLC only.[2]

Defendants have moved to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6). Because Plaintiffs have not sufficiently addressed the deficiencies identified by the Court in its August 29, 2022 Opinion as to their fraud, promissory fraud, negligent misrepresentation, and equitable estoppel claims against both Defendants and the breach of fiduciary duty claim against Ascend, the Court dismisses those claims with prejudice. But the Court allows Plaintiffs' breach of fiduciary duty claim against Askey to proceed given their allegations that Askey controlled Aryze, which gives rise to a fiduciary duty toward his fellow limited liability company ("LLC") members. The Court also again allows the promissory estoppel and quantum meruit claims to proceed.

## BACKGROUND[3]

Sweig, who lives in Deerfield, Illinois, has worked for nearly thirty years as a management consultant, investment banker, and entrepreneur. Sweig advises businesses in improving their operations, reducing costs, and increasing revenue and profitability. He has advised companies on mergers and acquisitions, financial restructuring, and capital management strategies. He has also worked with start-up ventures, including serving as CEO and COO. In 2013, Sweig formed Carcharadon, through which he performs his consulting work. Ascend, a

---

[2] Plaintiffs asked the Court for leave to file the SAC in order to add Ascend Build LLC as a party, indicating they do not intend to pursue any claim against Ascend Build but want to impose a constructive trust against Ascend Build covering the Aryze opportunity. Plaintiffs did not add Ascend Build as a party in the caption, however, nor does it appear that Ascend Build has been served. The Court does not address the status of Ascend Build as a party or any request to impose a constructive trust against Ascend Build in this Opinion.

[3] The Court takes the facts in the background section from the SAC and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

Delaware limited liability company with its principal place of business in Cambridge, Massachusetts, is a robotics business. Askey, a Massachusetts resident, formed Ascend in 2017.

Sweig learned of Askey, Robert Cohanim (another businessman associated with Ascend), and Ascend in 2017. Askey and Cohanim represented to Sweig that Ascend was developing robotics technology for commercial painting, with the technology projected to cut labor costs by substituting highly efficient robots for human labor. Askey indicated that Ascend could complete the robotics development but that it needed Sweig's business, finance, and management expertise to build a business based on the technology. Askey did not want to take investors into Ascend, intending instead to create a new entity for the business. Askey told Sweig that Ascend was well-capitalized, well-known, and respected in the early-stage venture capital financing community, and had access to capital sponsors to fund its commercial development. Askey indicated Ascend would contribute its existing and future technology to the new entity for exclusive "field of use" purposes in commercial construction and adjacent marketplaces. Doc. 43 ¶ 19. Sweig advised Askey that Ascend would have to make its intellectual property ("IP") and technology freely available to the new entity through an arms-length, perpetual royalty-free license agreement in order to attract investors to the new entity. Askey agreed that Ascend would provide such a license. Askey also indicated that the new entity's robot prototype would be ready for testing by August 2018.

Cohanim, Askey, and Ascend invited Sweig, working through Carcharadon, to join them in developing the new entity—which Askey formed and named Aryze, LLC—as a consultant. They anticipated that Sweig would develop a business plan for Aryze, bring investment into Aryze, and help attract an executive team. Sweig executed two written agreements in December 2017 and June 2018 to memorialize the consulting arrangement. Carcharadon, Askey, Cohanim,

and Phoenix Construction, LLC ("Phoenix") signed the December 2017 Agreement. Phoenix, Aryze's predecessor-in-interest, was never formed. Instead, shortly after the parties executed the December 2017 Agreement, Askey formed Aryze, which assumed all of Phoenix's obligations and rights under the Agreement. Under the December 2017 Agreement, Plaintiffs received a 5% minority equity interest in Aryze, along with voting rights. Ascend, as consideration for granting an exclusive, perpetual royalty-free IP license agreement, also became an equity voting member in Aryze, as did Askey. This division of equity gave Defendants voting control of Aryze. The parties amended the December 2017 Agreement in December 2018 to make clear that Carcharadon's ownership interests had "been fully earned and under no circumstances . . . subject to any vesting or claw-back provisions." *Id.* ¶ 80.

In early 2018, Ascend, through Askey, agreed to spin out its existing and future IP and technology, including applicable trademarks (the "Ascend IP"), to Aryze through an exclusive, perpetual, royalty-free IP license for use in the commercial painting industry and adjacent markets (the "IP License Agreement"). Beginning in early 2018, Defendants repeatedly confirmed the terms of the IP License Agreement with Plaintiffs, representing that Ascend would execute a formal IP License Agreement memorializing this arrangement. Between July 2018 and July 2019, Ascend's lawyers produced three drafts of the IP License Agreement.

In reliance on Ascend's representations to him, including about the IP License Agreement, in May 2018, Sweig terminated two other Carcharadon consulting agreements with Lego Systems and Alcentra Capital Corporation, which together paid him between $65,000 and $75,000 per month. Sweig also stopped soliciting new assignments through Carcharadon based on Askey's indication that Sweig would have a senior leadership position at Aryze as well as

4

serve on its board of directors. Sweig also decided not to pursue partnership opportunities presented to him by A.T. Kearney and Alvarez & Marshal.

In 2018 and 2019, Ascend, through Askey, approved various Aryze materials, including confidential investor memoranda ("CIMs") that Sweig prepared for potential Aryze investors. Sweig drafted these materials based on representations that Askey had made to him about the fact that the IP License Agreement "had been negotiated." *Id.* ¶ 57. The CIMs and other investor materials touted the IP License Agreement. For example, the fall 2018 CIM (prepared by Sweig) stated that "[r]esearch, [d]evelopment, and IP protection will be done by our partner Ascend in order to reduce complexity and avoid duplication of effort. Aryze has negotiated an exclusive, perpetual and royalty free agreement for the use of the technology in both core and adjacent markets." *Id.* ¶ 60. Askey told Sweig that the fall 2018 CIM "look[ed] great." *Id.* ¶ 62. An updated summer 2019 CIM repeated the same information. Sweig also prepared an eighteen-page management presentation for Aryze, which stated that "Aryze has an exclusive, perpetual and royalty free agreement to utilize the portfolio of Ascend's technologies in connection with all Aryze solutions." *Id.* ¶ 64. Askey again approved of this presentation.

By early 2018, Sweig had assembled various resources for Aryze's benefit, including experts such as Tom Danilek, a thirty-year veteran commercial real estate developer, and David Ascher, the president of one of the largest commercial painting companies in the United States. Sweig also assembled an advisory board for Aryze, which included Steven Tomlinson, head of real estate private equity at a major law firm; Greg Kranias, who worked at a private equity firm; Samuel Guren, a venture capital expert; John Kispert, who worked in the technology and chip manufacturing space and in private equity; and Joseph Massey, a former diplomat. Danilek met with Sweig and Askey in fall 2018, discussing the structure of Aryze and the IP License

Agreement. Danilek also reviewed the CIMs and other documents that Sweig had prepared for Aryze. Although Sweig identified himself as Aryze's CEO, he made Danilek aware that Askey controlled Aryze. Ultimately, Danilek became an advisor to Aryze in exchange for a promise of compensation and a vested equity interest in Aryze from Askey. Danilek never received any payment for his work on behalf of Aryze, however.

Also, during 2018 and 2019, Sweig contacted potential investors and customers, including venture capital and construction companies. In April 2019, Sweig initiated serious discussions with Saint-Gobain, a global building products and materials company, about investing in Aryze. On April 25, 2019, Sweig and Askey met with high level executives from Saint-Gobain, a global building products and materials company. During the meeting, Askey represented to Saint-Gobain's representatives that Ascend had granted Aryze the exclusive license to use its IP as set forth in the IP License Agreement. In early May 2019, Saint-Gobain reported an interest in making an investment in Aryze as its lead, strategic investor, inquiring later that month about Aryze's IP portfolio. Sweig told Saint-Gobain that Ascend owned the IP but that it "would be subject to the perpetual license agreement." *Id.* ¶ 87. During a June 2019 meeting with Saint-Gobain representatives, Askey explicitly confirmed that Ascend had granted Aryze the discussed IP license and that it was finalizing the IP License Agreement. By August 2019, Saint-Gobain had agreed on a written term sheet with Sweig on Aryze's behalf, pending the fully executed IP License Agreement.

Sweig also developed relationships with representatives of WeWork Companies, Inc., one of the largest commercial landlords. In late April 2019, Sweig reported to WeWork that the first preliminary field trial for the Aryze robot delivered successful results. By August 2019, Aryze had successfully completed the first of a two-phase pilot. Based on those results,

WeWork was seriously considering creating a binding, strategic relationship as an Aryze customer based in large part on representations about the IP License Agreement. Danilek and Sweig also engaged in negotiations with Hines, the commercial real estate developer for whom Danilek had worked, about investing in Aryze.

Moreover, Sweig undertook work outside the scope of the consulting agreements for Ascend's benefit, using his professional network to help Ascend develop applications for other products, such as cold storage/material handling, and leveraging Ascend's artificial intelligence engine in other platforms. Ascend never compensated Sweig for this additional work.

On August 26, 2019, Askey confirmed in writing that Plaintiffs had a 17.5% equity interest in Aryze, with Ascend having a 21.2% interest and Askey individually having a 22.8% interest. Although the Agreement reserved 30% of the membership units for a future employee pool, only Askey, Ascend, and Sweig had voting rights. This meant that Defendants had over 50% of Aryze's voting interests and thus controlled Aryze, with Sweig's equity interest increased to 25%. Askey further indicated that Ascend's goal was to support Aryze's growth and see Ascend obtain an investment return of at least $120 million.

On August 27, 2019, Askey sent Sweig a further draft of the IP License Agreement, which excluded the previously discussed perpetual, irrevocable, royalty-free IP license. Defendants initially represented that the omission would be corrected, but over the following three weeks, Sweig learned that Defendants did not intend to honor their prior representations about the IP license, instead intending to make Aryze dependent on Ascend for access to the Ascend IP. Thus, in early September 2019, Sweig told Askey that, as Aryze's CEO and as a fiduciary, he would not sign the latest IP License Agreement or present it to financing partners because it was not commercially reasonable or an arms-length transaction. On September 10,

7

2019, Sweig sent an email to Ascend's attorneys and others, representing that the current draft "seem[s] to be incongruous if not completely inconsistent with the business plan that has been circulated to investors for well over a year . . . a business plan signed off on by [Askey] and Ascend in the first half of 2018." *Id.* ¶ 119.

On September 15, 2019, Askey provided Sweig and Aryze's counsel with a further revised draft of the IP License Agreement prepared by Ascend's attorneys, which similarly reflected that the grant of an IP license to Aryze was not perpetual, irrevocable, unconditional, or royalty-free and did not give Aryze any rights to future IP developed by Ascend. During a September 17, 2019 conference call with Askey, Ascend representatives, and Sweig, Askey incorrectly represented that the September 15 draft aligned with the business plan Sweig had prepared. During this call, Askey made clear Ascend's intention to seize for its own benefit the work Sweig had done on Aryze's behalf, ultimately through a different company, Ascend Build. On a separate call that same day, Askey terminated Plaintiffs' services. In a follow-up email on September 19, Askey attached a letter, which he signed as an Aryze manager, confirming the termination of Sweig's agreements with Aryze. Askey stated:

> While I will not go into all the details and reasons here, the manner in which you have provided services to Aryze over the course of time, and especially over the past month, has led me to this decision. Most recently, in our call on the evening of September 17 with co-founders Ricky and Amy in which we discussed the upcoming fundraising proposal to Saint-Gobain, you indicated that if Saint-Gobain asked you in our upcoming meeting whether you agreed with the proposed license agreement that Aryze planned to present, you would state that you did not. This reinforced to Ricky, Amy, and me that your overall vision for the future of Aryze is not aligned [with] the collective vision of the founders. While you have provided important services over the years as an independent contractor and consultant, in my opinion you simply have not demonstrated the temperament that I want and that I feel Aryze needs in a CEO or in an executive-level role in the Company.

Doc. No. 43-19 at 2.  In the same letter, Askey also denied that Plaintiffs had any equity interest in Aryze.  This denial ignored Askey's August 26, 2019 email to Sweig and the December 2018 Amendment to the December 2017 Agreement, which both confirmed Plaintiffs' equity interest in Aryze.

Shortly after Askey terminated Sweig, Aryze ceased operations.  In October 2019, Askey formed Ascend Build, affiliated with Ascend.  In November 2019, Askey approached Saint-Gobain about making an investment in his "new" venture, but Saint-Gobain declined.

Plaintiffs are currently engaged in arbitration proceedings against Askey, in his individual capacity, and Aryze for breach of contract, fraud, and other business torts pursuant to the arbitration provisions in the consulting agreements.  Although Plaintiffs had also asserted claims against Ascend in the arbitration proceeding, a federal district court in Massachusetts ruled that, as a non-signatory to the agreements, Ascend was not bound to arbitrate Plaintiffs' claims against it.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits.  Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990).  In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor.  *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016).  To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014).  A claim is facially plausible "when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted). Rule 9(b) does not govern only claims of fraud; it applies to all allegations and averments of fraud. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011); *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements." *Borsellino*, 477 F.3d at 507.

## ANALYSIS

### I.       Fraud (Count I)

To state a fraud claim, Plaintiffs must allege that: (1) Defendants made a false statement or omission of material fact, (2) Defendants knew of or believed in its falsity, (3) Defendants intended to induce Plaintiffs to act, (4) Plaintiffs acted in reliance on the truth of Defendants' statement, and (5) damages resulted from Plaintiffs' reliance. *Weidner v. Karlin*, 402 Ill. App. 3d 1084, 1087 (2010). Plaintiffs set forth the following alleged misrepresentations of "past and existing material facts" that Askey made to Sweig:

> a.       Beginning in Spring 2018, Aryze was to be independent from Ascend Robotics. To achieve Aryze's independence, Ascend's IP and related technology in Aryze's field of use, related fields of use and adjacent markets would be "spun out" to Aryze through the IP License Agreement, the basic term of which

> provided Aryze with a perpetual, royalty free license of Ascend's IP and technology; and
>
> b.  Beginning in approximately Spring of 2018, Askey, on numerous occasions confirmed in writing and represented orally to Sweig, members of the Aryze Advisory Board, prospective investors and customers that the essential terms of the IP License Agreement – that Aryze "had" or "has" negotiated, i.e., an exclusive, perpetual, and royalty free IP license from Ascend Robotics for all of current and future Ascend IP and technology in the field of use, related fields of use and adjacent markets. Prior to the materials distribution, Askey's representations were repeatedly confirmed in CIMs, Teasers and related investor materials that Sweig prepared at Askey's direction and with Askey's direct involvement and with his explicit approval, individually and on behalf of Ascend Robotics.

Doc. 43 ¶ 144. The first set of statements, that Aryze "was to be independent" and that the Ascend IP and related technology "would be 'spun out,'" *id.*, amounts to promises about the future. *See Ault v. C.C. Servs., Inc.*, 232 Ill. App. 3d 269, 271 (1992) ("[A]lleged misrepresentations must be statements of present or preexisting facts, and not statements of future intent or conduct."). The Court addresses this in connection with Plaintiffs' promissory fraud claim and here focuses on the second set, Askey's statements about the terms of the IP License Agreement.

The Court initially reiterates that, to the extent that Plaintiffs contend that Askey approved of statements made in the CIMs and other materials that Sweig authored or that Askey made certain statements on behalf of Aryze, they cannot recover for such representations. *See* Doc. 37 at 20; *Abazari v. Rosalind Franklin Univ. of Med. & Sci.*, 2015 IL App (2d) 140952, ¶ 14 (specifying that the defendant must have made the false statement at issue). But Plaintiffs also allege that "in early 2018 Askey and Ascend Robotics agreed with and represented to Sweig that Ascend Robotics provided Aryze with an exclusive, perpetual, royalty free license enabling Aryze to use all current and future Ascend IP in the field of use, related fields of use," Doc. 43

11

¶ 37, and that "Askey repeatedly represented to Sweig, members of the Aryze Advisory Board, potential investors and customers that Ascend 'had' or 'has' agreed to the essential terms of the IP License Agreement," *id.* ¶ 42; *see also id.* ¶ 47 ("From early 2018 until late August of 2019, Askey repeatedly represented to Sweig, members of the Aryze Advisory Board, prospective investors and customers that, as previously represented, the terms of the IP License Agreement had been agreed upon[.]").  Plaintiffs buttress these allegations by pointing to two specific instances where Askey made such representations: (1) a November 15, 2018 meeting of Sweig, Askey, and Danilek, where Askey represented the terms of the IP License Agreement and the fact that Ascend's attorneys were memorializing the terms, *id.* ¶ 48; and (2) a June 12, 2019 meeting of Askey and Sweig with Saint-Gobain, where Askey confirmed that Ascend had granted Aryze the IP License Agreement, *id.* ¶¶ 90–91.

Among other things, Defendants contend that Plaintiffs have not adequately alleged reliance.  This element of a fraud claim requires that Plaintiffs' reliance be reasonable or justified.  *Dvorkin v. Soderquist*, 2022 IL App (1st) 201368, ¶ 87.  "In determining whether reliance was reasonable, all of the facts which plaintiff had actual knowledge of, as well as all of those it might have learned if it had used ordinary prudence, must be taken into account." *Loggerhead Tools, LLC v. Sears Holdings Corp.*, No. 12-CV-9033, 2016 WL 5111573, at *4 (N.D. Ill. Sept. 20, 2016) (quoting *Teamsters Local 282 Pension Tr. Fund v. Angelos*, 839 F.2d 366, 370 (7th Cir. 1988)), *aff'd*, 784 F. App'x 785 (Fed. Cir. 2019).  Here, as in their initial complaints, Plaintiffs allege that they reasonably relied on Askey's representations about the status of the IP License Agreement by continuing to work for Aryze and performing under the Agreements instead of terminating them.  Defendants, however, argue that Sweig, a sophisticated businessman who was represented by counsel, could not reasonably rely on an unexecuted

license agreement or an arrangement that he knew the parties continued to negotiate. *See Runnemede Owners, Inc. v. Crest Mortg. Corp.*, 861 F.2d 1053, 1059 (7th Cir. 1988) ("Taking into consideration that Ghura is an experienced businessman, he certainly should have proceeded with caution when confronted with oral representations inconsistent with the written terms of the contract, such as Rayman's 'we have a deal' assurances." (footnote omitted)). Nothing in the SAC undercuts the Court's prior conclusion that Sweig's reliance on the draft terms of the IP License Agreement was unreasonable. Doc. 37 at 20–21. The same reasoning applies to any oral or written statements Askey more generally made about the status of the IP License Agreement. As the SAC makes clear, the parties to the license (Ascend and Aryze) never executed a final version, a fact that Sweig knew and that Askey acknowledged when discussing the IP License Agreement with advisors and potential investors. *See, e.g.*, Doc. 43 ¶ 48 (Askey represented to Danilek in Sweig's presence that "Ascend Robotics' attorneys were memorializing those terms"); *id.* ¶ 92 (Askey represented to Saint-Gobain that "the written IP License Agreement was being finalized"). Because Sweig knew of facts that contradicted Askey's representations that Ascend had already granted Aryze the license and that Askey himself acknowledged this, the Court cannot find Sweig's alleged reliance on the misrepresentations that the license had already been granted reasonable. *See AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990) ("If the victim acted recklessly in the face of the alleged fraud, it is difficult to believe that he was actually deceived; he may simply regret having assumed a risk that has turned out badly."); *D.S.A. Fin. Corp. v. Cnty. of Cook*, 345 Ill. App. 3d 554, 561 (2003) ("If the party's reliance is unreasonable in light of the information open to him, the loss is considered his own responsibility."); *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 125–26 (1995) ("A person may not enter into a transaction with his

13

eyes closed to available information and then charge that he has been deceived by another." (citation omitted)).  As a result, Plaintiffs cannot recover for Askey's allegedly fraudulent statements concerning whether Ascend had granted Aryze the license contemplated by the IP License Agreement.[4]

## II.     Promissory Fraud (Count II)

To state a claim for promissory fraud, in addition to the elements of fraud discussed above, Plaintiffs must allege that Defendants made the misrepresentations "as part of a scheme to defraud."  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 413 (7th Cir. 2009); *see also Desnick v. Am. Broad. Cos.*, 44 F.3d 1345, 1354 (7th Cir. 1995) ("[P]romissory fraud is actionable only if it either is particularly egregious or . . . is embedded in a larger pattern of deceptions or enticements that reasonably induces reliance and against which the law ought to provide a remedy.").  The Court previously dismissed this claim, finding that Plaintiffs had not adequately alleged a scheme to defraud.  Doc. 37 at 18–19.  Specifically, the Court found that Askey's repeated assertions that Ascend would contribute its technology and would implement the IP License Agreement did not amount to a scheme to defraud.  *See Sols. Team, Inc. v. Oak St. Health, MSO, LLC*, No. 17-cv-1879, 2019 WL 462481, at *6 (N.D. Ill. Feb. 6, 2019) ("Plaintiffs cannot establish a scheme to defraud merely by alleging that defendants made the same representations multiple times."); *Nat'l Painting, Inc. v. PPG Architectural Finishes, Inc.*, No. 14 C 8054, 2015 WL 1593008, at *4 (N.D. Ill. Apr. 1, 2015) (repetition of fraudulent misrepresentations, without more, does not adequately allege a scheme to defraud).  The Court also found that Plaintiffs had not alleged that Defendants "engaged in other acts of trickery compounding the initial misrepresentations" or "that they perpetrate[d] this type of fraud as a

---

[4] Because the Court finds that Plaintiffs cannot allege reasonable reliance, the Court need not address Defendants' remaining arguments for dismissal of the fraud claim.

regular practice, or on any grand scale" that would allow the Court to infer a scheme to defraud. *LeDonne v. Axa Equitable Life Ins. Co.*, 411 F. Supp. 2d 957, 960–62 (N.D. Ill. 2006), *superseded on other grounds by statute*, 735 Ill. Comp. Stat. 5/2-2201. Finally, the Court concluded that Ascend's ultimate failure to enter into the IP License Agreement did not on its own demonstrate that it and/or Askey never intended to keep the promise to do so. *See BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 137 (7th Cir. 2011) ("[T]he fact that a party breaks a contract doesn't show that its promise to perform it had been fraudulent when made—that is, that the party had never intended to perform it."). Nothing in the SAC overcomes these problems that the Court previously identified; the Court again dismisses the promissory fraud claim.

### III. Negligent Misrepresentation (Count III)

To state a claim for negligent misrepresentation, Plaintiffs must allege: "(1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damage to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information." *Tricontinental Indus., Ltd. v. Pricewaterhouse Coopers, LLP*, 475 F.3d 824, 833–34 (7th Cir. 2007) (quoting *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 334–35 (2006)). The Court previously explained that, because Plaintiffs seek only economic damages, *i.e.*, damages not involving personal injury or property damage, "the duty to avoid negligently conveying false information is imposed only if the party accused of misrepresentation 'is in the business of supplying information for the guidance of others in their business transactions.'" *Dino Publ'g LLC v. Maritimo Mktg. Ams., Inc.*, No. 19 C 1921, 2019

15

WL 3857875, at *2 (N.D. Ill. Aug. 16, 2019) (quoting *First Midwest*, 218 Ill. 2d at 335); *Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 311 (2002). Otherwise, the *Moorman* or economic loss doctrine bars a plaintiff's attempt to recover purely economic losses through tort. *First Midwest*, 218 Ill. 2d at 337–42 (explaining *Moorman* doctrine and its two other inapplicable exceptions). In addressing the initial complaints, the Court concluded that Defendants did not engage in the kind of business that provided information for others to rely on in their own business transactions, and so the economic loss doctrine barred Plaintiffs' negligent misrepresentation claim. Doc. 37 at 22–23.

Plaintiffs disagree with the Court's analysis of the economic loss doctrine, insisting that it only applies where the duty arises from a breach of contract and that they have alleged an extracontractual duty that allows their claim to proceed. *See Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 162 (1994) ("Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty."); *Kanter v. Deitelbaum*, 271 Ill. App. 3d 750, 754–55 (1995) (economic loss doctrine did not bar negligence claim where the defendant's duty to the plaintiff was extracontractual). The Court need not resolve this question, however, because even assuming that the economic loss doctrine does not apply here because Defendants owed Plaintiffs a fiduciary duty, Plaintiffs' negligent misrepresentation claim fails. As discussed in connection with their fraud claim, Plaintiffs cannot allege that they reasonably relied on the alleged misrepresentations, one of the required elements of a negligent misrepresentation claim. *See Neptuno Treuhand-Und Verwaltungsgesellschaft Mbh v. Arbor*, 295 Ill. App. 3d 567, 575 (1998) ("[N]o recovery for fraudulent misrepresentation, fraudulent concealment or negligent misrepresentation is possible unless plaintiffs can prove justifiable reliance, i.e., that any reliance

16

was reasonable. . . .  If ample opportunity existed to discover the truth, then reliance is not justified.").  Therefore, the Court again dismisses the negligent misrepresentation claim.

## IV.    Breach of Fiduciary Duty (Count IV)

"To state a claim for breach of fiduciary duty under Delaware law, a plaintiff must allege that a fiduciary duty existed and that the defendant breached that duty."[5]  *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 604 (7th Cir. 2019).  The Court previously dismissed this claim, concluding that Defendants did not have any fiduciary duties to Plaintiffs as minority shareholders in Aryze because none of the parties had more than an expectancy interest in Aryze stock.  Doc. 37 at 27–30.  Plaintiffs have repleaded this claim, which Defendants argue fails because the Court correctly concluded that Defendants never had an equity interest in Aryze that would create a duty to Sweig.  Plaintiffs maintain that the Court erred in its analysis, particularly as it relied on general corporation law as opposed to that specific to LLCs.

In previously analyzing this issue, the parties and the Court glossed over this significant detail: Askey formed Aryze as an LLC.  Delaware law treats "any agreement (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, oral or implied, of the member or members as to the affairs of a limited liability company and the conduct of its business" as an LLC agreement.  Del. Code Ann. tit. 6, § 18-101(9).  In other words, Delaware's LLC Act "creates myriad opportunities for LLC agreements that range from the minimalistic to the ill-formed to the simply incomplete."  *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663 (Del. Ch. 2012); *see also XRI Inv. Holdings LLC v. Holifield*, 283 A.3d 581, 660 n.87 (Del. Ch. 2022) ("LLC agreements present themselves with varying levels of formality.  Under the LLC Act an LLC agreement can be 'written, oral or implied.'  An LLC agreement is also not

---

[5] The parties agree, and the Court accepts for the purposes of this motion, that Delaware law applies to this claim.

subject to the statute of frauds. And it need not consist of a single document; it can be a combination of written agreements, oral agreements, and implied understandings." (citations omitted)). Thus, the fact that stock had not formally issued does not have the determinative value that the Court ascribed to it for purposes of determining whether Defendants owed Plaintiffs a fiduciary duty, with a duty also arising if a party "exercises 'actual control' or 'control over the business and affairs of the corporation.'" *Klein v. Wasserman*, No. 2017-0643, 2019 WL 2296027, at *8 (Del. Ch. May 29, 2019) (citations omitted); *see Feeley*, 62 A.3d at 662 ("Under the LLC Act, there are two basic types of members: members who are also managers and exercise managerial functions in a member-managed LLC, and members who are passive investors like limited partners. Managers and managing members owe default fiduciary duties; passive members do not." (citations omitted)).

Here, Plaintiffs have adequately alleged that Askey, but not Ascend, served as managers or directors of Aryze with control over its affairs so as to impose a fiduciary duty on him. The SAC paints Ascend as a passive investor in Aryze, intending to contribute its IP but otherwise not taking an active role in the new venture. This is not enough. But the SAC alleges that Askey formed Aryze and controlled it at all times, including making the decision to terminate Plaintiffs' roles in Aryze. This sufficiently suggests that Askey had active managerial duties and control over Aryze's affairs, and thus fiduciary duties to Plaintiffs as his fellow LLC members. *See Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P.*, No. 1:21-CV-00038, 2022 WL 4072935, at *7 (S.D.N.Y. Sept. 2, 2022) ("In the absence of an LLC agreement or where the LLC agreement is silent, the Delaware Chancery Court consistently has found a default rule that a manager or director of the LLC owes fiduciary duties to fellow LLC members and to the LLC."). And because Defendants do not challenge the breach element of this claim, Plaintiffs

may proceed on it against Askey.[6]

## V.     Equitable Estoppel (Count V)

In its August 29, 2022 Opinion, the Court dismissed Plaintiffs' equitable estoppel claim, concluding that Illinois law does not recognize it as an affirmative claim. Doc. 37 at 33–34. Plaintiffs have nonetheless reasserted this claim in the SAC, arguing that the Court erred in this conclusion. But the cases it cites do not change the Court's determination that equitable estoppel serves only as "a defense to preclude a party from denying a representation of past or existing fact," not as an affirmative claim for damages. *Matthews v. Chi. Transit Auth.*, 2016 IL 117638, ¶ 94 n.11; *see also Healy v. Moderne Cap., LLC*, No. 20 C 567, 2020 WL 4464702, at *2 (N.D. Ill. Aug. 4, 2020). In *In re Scarlett Z.-D.*, the Illinois Supreme Court addressed equitable estoppel as a defense to the plaintiff's standing, not as a standalone claim. 2015 IL 117904, ¶ 23. And in *Patrick Engineering v. City of Naperville*, the plaintiff sought to use equitable estoppel only as a means of proving its breach of contract claim. 2012 IL 113148, ¶ 33. Because neither case suggests that Plaintiffs may pursue equitable estoppel as an independent cause of action, the Court again dismisses Plaintiffs' equitable estoppel claim.

## VI.     Promissory Estoppel (Count VI)

To state a claim for promissory estoppel, Plaintiffs must allege that: (1) Askey and Ascend (through Askey) made an unambiguous promise to Sweig; (2) Sweig reasonably and

---

[6] In reply, Defendants argue that the economic loss doctrine bars the fiduciary duty claim. Aside from raising this argument too late, the Court does not find it persuasive because Delaware law supplies the default fiduciary duties, which do not arise by way of contract. *See Life Spine, Inc. v. Aegis Spine, Inc.*, No. 19 CV 7092, 2020 WL 1275004, at *7 (N.D. Ill. Mar. 17, 2020) ("Put differently, claims for breach of fiduciary duty or other torts that exist 'independent of the contract,' as opposed to 'by operation of the contract itself,' are exempted from the Moorman doctrine because of the "extra-contractual duty between the parties." (collecting cases)); *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 104–05 (3d Cir. 2001) (economic loss doctrine did not bar fiduciary duty claim where fiduciary duty imposed obligations on defendant "that went well beyond the particular obligations contained in the Agreement itself" and were imposed "as a matter of social policy" instead of "by mutual consensus").

justifiably relied on the promise; (3) Sweig's reliance was expected and foreseeable by Defendants; and (4) Sweig relied on the promise to his detriment. *Quake Constr., Inc. v. Am. Airlines, Inc*., 141 Ill. 2d 281, 310 (1990); *Newton Tractor Sales, Inc. v. Kubota Tractor Corp*., 233 Ill. 2d 46, 51 (2009). "Promissory estoppel is meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill." *All-Tech Telecom, Inc. v. Amway Corp*., 174 F.3d 862, 869 (7th Cir. 1999); *see also McVickers McCook, LLC v. Wal-Mart Stores, Inc*., No. 09 C 7523, 2010 WL 3283044, at *6 (N.D. Ill. Aug. 12, 2010) ("[P]romissory estoppel is not meant to be a substitute for a breach of contract claim."); *Matthews*, 2016 IL 117638, ¶ 92 ("Application of promissory estoppel is proper only in the absence of an express agreement."); *Olson v. Hunter Point Homes, LLC*, 2012 IL App (5th) 100506, ¶ 13 (same).

The Court previously allowed Plaintiffs' promissory estoppel claim to proceed. Doc. 37 at 23–25. The Court refused to dismiss the claim against Ascend based on the existence of the integration clauses in the consulting agreements because Ascend was not a party to those agreements. *Id.* at 24. The Court further found that Plaintiffs' promissory estoppel claim was sufficiently different from the consulting agreements because the consulting agreements concerned Sweig's provision of professional services to Aryze while the promissory estoppel claim concerned promises that Sweig claimed caused him to forgo other employment. *Id.* at 24– 25. The Court did not address Defendants' statute of frauds argument because they raised it for the first time in reply. *Id.* at 25.

With the filing of the SAC, Defendants properly raise the statute of frauds as a reason for dismissal of this claim.[7] "[P]romissory estoppel does not bar the application of the statute of frauds." *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 492 (1997). Illinois' statute of frauds renders promises and agreements that cannot be performed within one year unenforceable. 740 Ill. Comp. Stat. 80/1. "The test for determining whether the statute of frauds applies to a contract is whether the contract is capable of being performed within one year of its formation, not whether such occurrence is likely." *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 370 (2006). Here, Plaintiffs' promissory estoppel claim focuses on Askey's alleged promise to execute the IP License Agreement. Although Ascend never executed that agreement, nothing suggests that it could not have done so within a year, and so the statute of frauds does not bar the claim.[8] *Id.*

Defendants next argue that the promissory estoppel claim fails because Plaintiffs have not identified an unambiguous promise. They maintain that Askey's promise that Ascend would execute the IP License Agreement facially contradicts other representations that Defendants

---

[7] Defendants could have and should have raised the arguments they now make for dismissal of the promissory estoppel claim in their initial motion to dismiss Plaintiffs' complaints, particularly given that the SAC does not materially change the allegations related to this claim. *See Burton v. Ghosh*, 961 F.3d 960, 968 (7th Cir. 2020) ("[T]he invitation to answer an amended complaint should be understood as permission to plead in response to the amendments, as contemplated by Rule 15(a)(3), unless leave is expressly given to raise new defenses unrelated to the amendments. In the usual course, this means responding to the new substance of the amended complaint."); Wright & Miller, 5C Federal Practice & Procedure § 1388 ("The filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading."). Nonetheless, the Court finds it appropriate to address Defendants' arguments on their merits given that the parties have fully briefed the issues.

[8] Defendants argue that the Court should consider not whether Ascend could execute the IP License Agreement within a year but rather the "consideration" Plaintiffs gave for the promise—Sweig's performance of services to Aryze—which they maintain he could not because he worked for Aryze for almost two years. But this again confuses the issues, as Plaintiffs' promissory estoppel claim does not focus on Sweig's agreement to provide services to Aryze under the consulting agreements nor do Plaintiffs have to allege consideration to pursue a promissory estoppel claim. *See Matthews*, 2016 IL 117638, ¶ 93 ("Under Illinois law, a promissory estoppel claim will succeed where the other elements of a contract exist (offer, acceptance, and mutual assent), but consideration is lacking.").

allegedly made about the fact that the license had been finalized and so creates an ambiguity. But the Court finds no such ambiguity, given Plaintiffs' acknowledgment that Askey represented that the agreement had been negotiated but that the ministerial details remained to be finalized. Plaintiffs have set forth the IP License Agreement's specific terms. These details differentiate this case from those where courts have found promises to enter into agreements too indefinite. *Cf. Sembos v. Philips Components*, 376 F.3d 696, 704 (7th Cir. 2004) (promise of employment without specification of a position, salary, or other terms of employment was too indefinite to constitute an unambiguous promise).

Defendants also argue that Plaintiffs cannot plead reliance because the consulting agreements already obligated them to provide services to Aryze. Indeed, "once consideration is found to exist, a party to the contract can no longer maintain an action for promissory estoppel where the performance which is said to satisfy the requirement of detrimental reliance is the same performance which supplies the consideration for the contract." *Prentice v. UDC Advisory Servs., Inc.*, 271 Ill. App. 3d 505, 512 (1995). But Plaintiffs focus not on their obligations to Aryze but rather on the fact that Defendants' promises about the IP License Agreement allegedly caused Sweig to forgo other employment. Although a factual question may exist as to whether Sweig could have provided the services under the consulting agreements and undertaken other consulting opportunities at the same time, at this stage, Plaintiffs' allegations sufficiently suggest reliance independent of their obligations under the consulting agreements.[9] *Cf. id.* at 514 ("Promissory estoppel cannot be based upon a promise which only induces plaintiffs to do that

---

[9] The SAC does include an allegation that Sweig had to terminate other consulting agreements "to enable him to meet his increasing responsibilities to Aryze." Doc. 43 ¶ 73. Defendants point to this allegation to argue that Sweig acknowledges that he forwent business opportunities "to meet his existing duties under the consulting agreements." Doc. 56 at 8. Because the Court reads the SAC in the light most favorable to Plaintiffs at this stage, it does not find that this allegation forecloses Plaintiffs' contention that he could have undertaken these outside opportunities regardless of his obligations under the consulting agreements.

which they were already legally bound to do.").  And unlike the misrepresentation claims, where the Court has found that Plaintiffs cannot plead that any reliance was reasonable, here the Court accepts that Plaintiffs detrimentally relied on Askey's promises because those alleged promises involved the existence of and the intention to finalize the IP License Agreement, not just the representation that such an agreement already existed.

Finally, Defendants argue that the parol evidence rule bars the promissory estoppel claim. "[A] dispute as to the terms of a contract rather than its existence cannot be grounds for invoking the doctrine of promissory estoppel where to do so would violate the parol evidence rule."  *Id.* But as the Court previously recognized, the consulting agreements do not address the subject matter at issue in the promissory estoppel claim.  Doc. 37 at 24–25.  Indeed, the integration clauses specify that the consulting agreements only concern "Carcharadon's engagement," with no discussion of the Ascend IP.  *See* Doc. 43-1 at 4; Doc. 43-2 at 4.  Thus, the integration clauses in the consulting agreements and the parol evidence rule do not bar Plaintiffs' claim about the IP License Agreement, allowing Plaintiffs' promissory estoppel claim to proceed.

## VII.   Quantum Meruit (Count VII)

In its August 29, 2022 Opinion, the Court allowed Plaintiffs to pursue their quantum meruit claim alleging that Sweig performed work for Ascend's benefit outside the scope of the consulting agreements absent compensation against Ascend.  Ascend now argues that the statute of frauds bars this claim.[10]  But Ascend cites to no authority indicating that the statute of frauds applies to quantum meruit claims, and courts have instead recognized that such recovery

---

[10] In reply, Ascend also argues that quantum meruit's purpose is incompatible with Plaintiffs' claims because they already received compensation for their work.  Ascend only raised this argument in reply, waiving it.  *See Multi-Ad Servs., Inc. v. NLRB*, 255 F.3d 363, 370 (7th Cir. 2001) ("It is well-settled that parties may not raise new arguments or present new facts for the first time in reply.").  But the Court also does not find this argument persuasive because Plaintiffs claim they performed work unrelated to their responsibilities under the consulting agreements, for which they received no compensation.

23

becomes available where oral agreements are rendered unenforceable because of the statute of frauds. *See, e.g.*, *Fischer v. First Chicago Cap. Mkts., Inc.*, 195 F.3d 279, 284 (7th Cir. 1999) (noting the possibility of recovering under quantum meruit despite the fact that promissory estoppel claim failed under the statute of frauds); *In re Rowell*, 606 B.R. 329, 344 (Bankr. N.D. Ill. 2019) ("Illinois courts have recognized the existence of a claim in restitution for performance on an unenforceable contract, including on the basis of the statute of frauds, to avoid unjust enrichment." (footnote omitted)); *Cove Mgmt. v. AFLAC, Inc.*, 2013 IL App (1st) 120884, ¶ 34 ("Plaintiffs often plead *quantum meruit* as an alternative claim in breach of contract actions so that the plaintiff may recover even if the contract is unenforceable."). Thus, Plaintiffs may proceed against Ascend on their quantum meruit claim.

## VIII. Dismissal with Prejudice

Because Plaintiffs have had several opportunities to state a valid claim and further amendment would be futile, the Court dismisses the fraud, promissory fraud, negligent misrepresentation, and equitable estoppel claims against both Defendants and the breach of fiduciary duty claim against Ascend with prejudice. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 734–35 (7th Cir. 2014) (affirming dismissal with prejudice of first amended complaint after initial complaint was dismissed without prejudice); *Pirelli Armstrong Tire Corp., Retiree Med. Benefits Tr. v. Walgreen Co.*, No. 09 C 2046, 2010 WL 624709, at *1 (N.D. Ill. Feb. 18, 2010) (dismissing amended complaint with prejudice after previous dismissal of ICFA and unjust enrichment claims without prejudice), *aff'd*, 631 F.3d 436 (7th Cir. 2011).

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [Case No. 21 C 2890, Doc. 44; Case No. 21 C 6841, Doc. 18]. The Court dismisses the fraud, promissory fraud, negligent misrepresentation, and equitable estoppel claims (Counts I, II, III, and V) against both Defendants and the breach of fiduciary duty claim (Count IV) only against Ascend with prejudice.

Dated: May 9, 2023

SARA L. ELLIS
United States District Judge

25